**METHODIST HOSPITALS OF DALLAS, Appellant,**

v.

**AMERIGROUP TEXAS, INC. f/k/a Americaid Texas, Inc., Appellee.**

No. 05–05–01579–CV.

Court of Appeals of Texas, Dallas.

Aug. 9, 2007.

Rehearing Overruled Sept. 13, 2007.

Blair Grant Francis, Francis Orr & Totusek, L.L.P., Dallas, for appellant.

David N. Kitner, P. Michael Jung, Strasburger & Price, L.L.P., Dallas, for appellee.

Before Justices MOSELEY, BRIDGES, and SMITH.[1]

## OPINION

Opinion by Justice BEA ANN SMITH.

To address concerns raised in Appellant's Motion for Rehearing, we withdraw our earlier opinion. This is now the opinion of the court. The Motion for Rehearing is overruled.

In this case, we are asked to construe the terms of two contracts executed under the state Medicaid managed care program to determine whether appellee, a Medicaid HMO, was contractually obligated to pay for healthcare services provided by Methodist Hospitals of Dallas (Methodist). In nine issues, Methodist contends that the trial court erred when it denied Methodist's motion for summary judgment and granted summary judgment for Amerigroup Texas, Inc. (Amerigroup). Methodist insists that Amerigroup was liable for payment under the terms of both its provider contract with Methodist and its contract with the Texas Health and Human Ser-

1. The Honorable Bea Ann Smith, Justice, Court of Appeals, Third District of Texas at Austin, Retired, sitting by assignment.

vices Commission.[2] Methodist asserts five grounds in support of its contention: (1) the summary judgment evidence does not establish that the patient, Felicia Carraway, lost her Medicaid eligibility on December 31, 2001, or on the date she became eligible for Supplemental Security Income (SSI);[3] (2) the distinction between Medicaid eligibility under the Temporary Assistance for Needy Families program (TANF)[4] and traditional Medicaid based on SSI eligibility is immaterial; (3) even if there was a gap in the patient's Medicaid eligibility, Amerigroup was still responsible for payment under various terms of the contracts; (4) Amerigroup was bound by the Commission's initial determination that Amerigroup was responsible for payment; and (5) the payment that Methodist received from the State does not discharge Amerigroup's liability. Methodist further asserts that Amerigroup breached a statutory obligation to promptly pay claims, and is therefore liable for the full amount for services rendered by Methodist in the amount of $1,840,734. Alternatively, Methodist contends that Amerigroup is liable under its contract with Methodist for $1,351,817, the contract rate for the charges billed.[5]

The distinction between mandatory and voluntary participation in the HMO, as defined in the federal waiver controlling the state's eligibility determinations, is critical to our analysis. Only specifically defined categories of persons are eligible for mandatory participation in an HMO. The patient was qualified for mandatory participation in Amerigroup when she entered the hospital on December 19, 2001. Later that month, when Carraway became eligible for SSI, she was disqualified under federal law from mandatory membership in the HMO. The Commission has the sole authority to make Medicaid HMO eligibility determinations and to designate those persons who qualify as mandatory enrollees in the HMO. Once the Commission determined that the patient was ineligible for mandatory participation in the HMO, Amerigroup was no longer obligated to pay for her medical expenses unless another contractual term applied to continue the obligation. The contractual term on which Methodist relies, however, does not produce a different result. The term only applies if the patient's eligibility for Medicaid continues without interruption, and Carraway's eligibility terminated on December 31, 2001, creating a gap in coverage from January 1–8, 2002. Because we conclude that the Commission has the statutory and contractual authority to determine Medicaid eligibility within the limitations imposed by federal law, and because the contractual provisions upon which Methodist relies do not apply, we affirm the summary judgment entered by the trial court.

2. At the time the contracts in this case were executed, the task of determining Medicaid eligibility had been delegated by the Texas Health and Human Services Commission to the Texas Department of Health (the Department). As of September 1, 2004, however, the Commission is now the single state agency responsible for administering the Medicaid program in Texas. TEX. GOV'T CODE ANN. § 531.021 (Vernon Supp.2006). For ease of reference, the Commission and the Department will be collectively referred to as "the Commission."

3. SSI is a federally funded cash assistance program for the elderly and disabled poor. See 42 U.S.C. § 1382a.

4. TANF (formerly Aid to Families With Dependent Children) is a federal-state program providing cash assistance to impoverished families, usually headed by a single parent. See 1 TEX. ADMIN.CODE § 374.1 (2006).

5. Under the contract between Amerigroup and Methodist, the HMO pays 75% of billed charges, subject to a per diem cap.

## BACKGROUND

### A. *Regulatory Framework.*

■ The Medicaid statute, Subchapter XIX of the Social Security Act, established a cooperative plan between the federal government and the states to provide medical services to certain defined categories of low-income individuals. 42 U.S.C. §§ 1396–1396v. The program is jointly funded by the federal and state governments and is administered by the states pursuant to federal guidelines. *See generally* 42 U.S.C. §§ 1396a, 1396b; 42 C.F.R. § 430.0–.25 (2005). To qualify for federal funding, a state must have its own Medicaid plan approved by the Health Care Financing Administration (HCFA) of the United States Department of Health and Human Services. 42 U.S.C. § 1396; 42 C.F.R. § 430.10. State Medicaid programs are required to follow fundamental principles set forth in the Social Security Act and comply with all mandates related to eligibility and covered services. *Frew v. Hawkins*, 540 U.S. 431, 434, 124 S.Ct. 899, 157 L.Ed.2d 855 (2004) (once a state elects to join the program it must administer a plan that meets federal requirements). One of the fundamental federal requirements is freedom of choice; Medicaid recipients must be allowed to select any health care provider who meets program standards and elects to provide services. *See* 42 *U.S.C.* § 1396a(a)(23); 42 C.F.R. § 431.51(b)(1)(i). States seeking to limit a recipient's freedom of choice must obtain a specific exemption in a waiver granted by the Centers for Medicare and Medicaid Services (CMS). *See* 42 U.S.C. § 1396n(b); *see also* 42 C.F.R. § 430.25(b) (stating that "waivers are intended to provide the flexibility needed to try new or different approaches to efficient and cost-effective delivery of health care services, or to adopt their programs to the special needs of particular areas or groups of recipients").

### B. *The Texas Medicaid Plan.*

Texas has elected to participate in the federal Medicaid program. *See* TEX. HUM. RES.CODE ANN. § 32.001 (Vernon 2006). The Commission is charged with the chief responsibility for the Medicaid program in Texas. TEX. GOV'T CODE ANN. § 531.021 (Vernon Supp.2006). In order to streamline the program, Texas instituted the State of Texas Access Reform Program (STAR). STAR allows the Commission to contract with managed care organizations [6] to provide health care services to certain Medicaid recipients. Because STAR restricts the ability of Medicaid recipients to select their health care provider, the Commission was required to obtain a waiver of the federal freedom-of-choice requirement.

Under the waiver, only expressly enumerated categories of Medicaid-eligible persons may legally be deprived of their freedom of choice and be deemed a "mandatory" member of a specific Medicaid HMO. Persons eligible to receive TANF may be designated as mandatory participants in a Medicaid HMO. The waiver identifies other categories of Medicaid-eligible persons who may elect to participate in a Medicaid HMO, but who are not required to do so. These optional participants are defined in the waiver as "voluntary" members of the HMO. Persons who are eligible to receive SSI are among those designated as voluntary participants. Unlike persons eligible for Medicaid under TANF, persons eligible for Medicaid under SSI cannot be compelled to join an HMO.

---

**6.** A managed care organization is a type of health maintenance organization (HMO) "in which the over-all care of a patient is coordinated by or through a single organization." 1 TEX. ADMIN. CODE § 353.2(36) (2006).

The contracts at issue in this case further distinguish between mandatory and voluntary participation. Mandatory members are entitled to receive full health care services, for which Amerigroup receives a monthly capitation payment. Voluntary members receive only administrative services, for which Amerigroup receives a nominal monthly fee. Amerigroup is not obligated to pay for the medical expenses of these voluntary members.

The Commission pays Medicaid providers like Methodist on a traditional fee-for-service basis (at a substantially lower rate of reimbursement) or it pays a capitation rate to an HMO which in turn reimburses the provider at a higher rate, still discounted from the full cost of services.[7] A capitation payment is a fixed sum that is paid monthly to an HMO on a per-member basis, regardless of the amount of services used by that member. Capitation payments are described as "full risk" because the HMO bears the risk that the capitated payment received for an insured may be insufficient to cover the cost of that insured's medical needs for any given month. David M. Studdert, *Direct Contracts, Data Sharing and Employee Risk Selection: New Stakes for Patient Privacy in Tomorrow's Health Insurance Markets*, 25 Am. J. Law & Med. 233, 236 (1999) (discussing full risk payments). This method of financing distinguishes managed-care service plans from traditional fee-for-service arrangements where the provider is reimbursed according to a fee schedule established by the Commission. *See Equal Access for El Paso, Inc. v. Hawkins*, 428 F.Supp.2d 585, 593–94 (W.D.Tex.2006).

In this instance, Amerigroup paid Methodist a higher rate for services rendered to Carraway from December 19–31, 2001. Methodist was paid at the lower traditional Medicaid rate for services rendered to Carraway from January 1, 2002 until her death in 2004. Methodist seeks to recover the higher rate of reimbursement from Amerigroup for all services rendered to Carraway based on Amerigroup's contractual obligation to pay for all services once a mandatory participant is admitted to the hospital, unless the patient becomes ineligible for Medicaid. "Ineligibility" occurs when there is either a complete loss of eligibility, or a temporary loss of eligibility that results in a gap in coverage. Methodist contends that Amerigroup is liable because Carraway never became ineligible for Medicaid, either permanently or because of a gap in coverage.

### C. *The Lawsuit.*

Amerigroup, a managed care organization, became a Medicaid HMO participating in STAR pursuant to a 1999 contract with the Commission (the Commission Contract). In the same year, Amerigroup also contracted with Methodist to pay for services rendered to the mandatory members of the Amerigroup HMO (the Provider Contract).

Because Carraway was receiving TANF, she lost her ability to choose her healthcare provider, and the federal waiver permitted the Commission to enroll her as a mandatory participant in an HMO. On February 1, 2000, the Commission designated Carraway a mandatory member of Amerigroup. On December 19, 2001, Carraway was admitted to Methodist Hospital suffering from renal disease. She went into septic shock and cardiopulmonary arrest and lapsed into a coma from which she never emerged. Carraway remained hospitalized at Methodist until her death on January 27, 2004.

---

7. *See* note 5.

At some point in December 2001, Carraway voluntarily withdrew from TANF. Consequently, on December 31, 2001, the Commission removed her from the Medicaid eligibility rolls.

The Commission was unaware that Carraway had earlier applied for SSI on February 20, 2001. On January 8, 2002, the Commission received notice that the Social Security Administration ("Social Security") had certified Carraway as eligible to receive SSI benefits; it also made her SSI eligibility retroactive to the month she applied for benefits. As an SSI recipient, effective February 1, 2001, Carraway could only be classified as a voluntary member of Amerigroup.

After Carraway's hospitalization on December 19, 2001, Methodist began to bill Amerigroup for the medical expenses she incurred. In February 2002, the Commission notified Amerigroup that it was no longer responsible for Carraway's medical expenses. In November 2002, Methodist officially requested the Commission to reconsider who was responsible for payment of Carraway's expenses after December 31, 2001. Revisiting the issue, the Commission reversed its earlier decision and concluded that Amerigroup was responsible for all medical services provided to Carraway after she was admitted. Based on this determination, Amerigroup paid Methodist $349,067.43 for services provided to Carraway through August 28, 2002. But that was not the end of this complex dispute.

On January 15, 2003, Amerigroup reconsidered its position and advised Methodist that it would not be liable for any medical services rendered after Carraway was removed as a mandatory participant on December 31, 2001. Therefore, all but $19,374.00 of its payment had been made in error.[8] In response to Amerigroup's adjusted payment, Methodist again requested the Commission to investigate. In March 2003, the Commission reversed itself and concluded that Amerigroup was not obligated to pay for services rendered to Carraway after December 31, 2001.

Specifically, the Commission found that because Carraway voluntarily withdrew from TANF, she was properly removed from the Medicaid eligibility rolls as of midnight on December 31, 2001. Although Carraway regained Medicaid eligibility when she was certified as SSI eligible on January 8, 2002, there was a gap in Carraway's Medicaid eligibility in the eight-day interim between January 1 and January 8. Therefore, the Commission concluded that Amerigroup was not responsible for any of Carraway's medical expenses incurred after December 31, 2001. Instead, the Commission found that the State was responsible for Carraway's medical expenses under traditional Medicaid and advised Methodist that it should submit a claim to National Heritage Insurance Company[9] (NHIC). Methodist submitted a claim, and on June 2, 2003, NHIC paid $436,800 to Methodist.[10]

Methodist initiated this action against Amerigroup and asserted, *inter alia*, that

---

**8.** It appears that Amerigroup offset $321,693.43, the difference between the $349,067.43 it paid and the amount it thought it owed, from other payments due to Methodist. At that time, Amerigroup did not dispute that it owed $19,374.00 for services rendered to Carraway between December 19–31, 2001.

**9.** NHIC is the claims administrator for the traditional fee-for-service Medicaid program.

**10.** The record is unclear about the time frame in which the charges covered by this payment were incurred. By law, however, the State may only pay claims up to $200,000 per year for individuals covered under the traditional fee-for-service Medicaid. 1 TEX. ADMIN. CODE § 354.1149(20) (2006).

Amerigroup breached both its Provider Contract and its Commission Contract when it failed to pay for Carraway's medical care after December 31, 2001.[11] Both parties moved for summary judgment. The trial court granted summary judgment on behalf of Amerigroup and denied Methodist's motion. This appeal followed.

## STANDARD OF REVIEW

The standard of review in a traditional summary judgment case is well-established. *See* TEX.R. CIV. P. 166a(c); *Black v. Victoria Lloyds Ins. Co.*, 797 S.W.2d 20, 23 (Tex.1990). When, as here, both parties move for summary judgment, each party bears the burden of establishing that it is entitled to judgment as a matter of law; neither party can prevail because of the other's failure to discharge its burden. *City of Garland v. Dallas Morning News*, 969 S.W.2d 548, 552 (Tex.App.-Dallas 1998) (en banc), *aff'd*, 22 S.W.3d 351 (Tex.2000). We review summary judgment evidence presented by both parties and determine all questions presented. *Id.* at 356. When the trial court's order granting summary judgment does not specify the grounds upon which it was granted, we will affirm the judgment if any of the theories advanced are meritorious. *Carr v. Brasher*, 776 S.W.2d 567, 567 (Tex.1989).

## DISCUSSION

A. *Loss of Medicaid Eligibility Under the Contract.*

■ In its first issue, Methodist asserts that Amerigroup remained liable for services rendered to Carraway after December 31, 2001, because Carraway never lost her Medicaid eligibility. The loss of Medicaid eligibility is material because paragraph 6.3.2 of the Commission Contract provides:

**Inpatient Admission After Enrollment in HMO.**

HMO is responsible for all charges until the member is discharged from the hospital/facility or until the Member loses Medicaid eligibility.

Methodist insists that Carraway did not lose her Medicaid eligibility but moved seamlessly from TANF-based eligibility to SSI-based eligibility.[12] According to Methodist, the phrase "Medicaid eligibility" means eligibility under any program. Thus, even if Carraway lost her TANF-based eligibility on December 31, 2001, she remained eligible for Medicaid as an SSI beneficiary; therefore there was no loss of Medicaid eligibility under the terms of the Commission Contract. Methodist contends Carraway was retroactively eligible for Medicaid on February 20, 2001, the date on which the Commission registered Social Security's certification of her eligibility for SSI benefits.[13] Alternatively, Methodist contends that Carraway's eligibility for benefits should not be measured using the January 8, 2002 date the Commission registered Social Security's certification of Carraway's eligibility for SSI. Instead, Methodist urges the time period is correctly measured using the December

---

**11.** Methodist asserts that it is an intended third-party beneficiary of the Commission Contract. *See Stine v. Stewart*, 80 S.W.3d 586, 591 (Tex.2002). Amerigroup does not dispute this contention.

**12.** An individual who is eligible for SSI is automatically eligible for Medicaid. *See* 1 TEX. ADMIN. CODE § 358.610 (2004).

**13.** Paradoxically, if this were true, Carraway would not have been a mandatory member of the Amerigroup HMO on December 19, 2001, when she was admitted to the hospital.

27, 2001 date on which Social Security made its initial determination concerning Carraway's eligibility. Using either the February 20, 2001, retroactive effective date or the December 27, 2001, initial determination date, Methodist maintains there was no loss of Medicaid eligibility. We disagree.

The distinction between eligibility based on TANF and eligibility based on SSI is critical because the federal waiver precludes the mandatory enrollment of SSI recipients in an HMO. The Commission's discretion to administer the state Medicaid program is qualified by the requirement that a state opting to participate in Medicaid must comply with federal law. *See Wilder v. Virginia Hosp. Assoc.*, 496 U.S. 498, 502, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990). Eligibility determinations must comply with the limited exceptions delineated in the federal waiver. In paragraph 6.6 of the Provider Contract, the parties acknowledge that the transactions contemplated under the agreement may be subject to regulation by the state and federal government. Paragraph 6.6 further provides that "[e]ach party shall carry out all activities ... in conformance with all applicable federal, state and local laws, rules and regulations...." In paragraph 2.2 of the Provider Contract, Methodist acknowledges that the services provided under the agreement are funded by Medicaid and that it is "subject to all state and federal laws, rules and regulations ... that apply to persons or entities receiving state and federal funds." Under the terms of the federal waiver, once Carraway became eligible for SSI, she was disqualified from mandatory participation in the Amerigroup HMO. Although Carraway remained Medicaid-eligible based on her eligibility for SSI, she could no longer be enrolled as a mandatory member of an HMO.

When the relevant portions of the state and federal rules and statutes and the federal waiver are read in conjunction with the Commission Contract and the Provider Contract, it is clear that Carraway's SSI-based eligibility, regardless of the date from which it is measured, is not the type of Medicaid eligibility paragraph 6.3.2 of the Commission Contract is intended to include. *See Dallas Cent. Appraisal Dist. v. Cunningham*, 161 S.W.3d 293, 295 (Tex. App.-Dallas 2005, no pet.) (statutes are to be considered as a whole to harmonize all provisions); TEX. GOV'T CODE ANN. § 311.021 (Vernon 2005) (statutory construction involves presumption that just and reasonable result intended); *United Protective Servs., Inc. v. West Village Ltd. Partnership*, 180 S.W.3d 430, 432 (Tex. App.-Dallas 2005, no pet.) (written contracts are construed to ascertain true intentions of parties expressed in the instrument).

■ Amerigroup's contractual obligation to pay for medical services depends on Carraway's status as a mandatory member of the HMO. Under paragraph 6.1.1 of the Commission Contract, Amerigroup is only obligated to pay for covered services "provided to mandatory-enrolled members for whom [Amerigroup] is paid a capitation payment." Paragraph 6.2 of the Commission Contract provides that "HMO is responsible for providing all covered services to each eligible Member...." Under the Commission Contract, a "member" is a person who: (1) is entitled to benefits under Medicaid; (2) is in a Medicaid eligibility category included in the STAR program; and (3) is enrolled in the STAR program. When an HMO provides healthcare service pursuant to a contract requiring a federal waiver, the plan is included in the STAR program. *See* TEX. ADMIN. CODE § 353.2(57) (2006). As an SSI beneficiary, Carraway was not in a Medic-

aid eligibility category included in the STAR program, and was therefore ineligible to be a mandatory member of the HMO. The specific sections of the Commission Contract describing eligibility and mandatory enrollment control the general provisions of paragraph 6.3.2 concerning liability. *See Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133–134 (Tex.1994) (discussing rule of contract construction that the specific controls the general). When provisions of a contract appear to conflict, we will endeavor to harmonize the provisions to reflect the true intentions of the parties. *See Edlund v. Bounds*, 842 S.W.2d 719, 726 (Tex.App.-Dallas 1992, writ denied). The Commission found Carraway's eligibility ended January 1, 2002. The Commission certified Carraway's eligibility for SSI benefits on January 8, 2002. As a result, the Commission disenrolled Carraway from mandatory membership in the Amerigroup HMO. The Commission has the exclusive statutory and contractual authority to make enrollment and eligibility decisions. When the Commission found Carraway was no longer eligible to be a mandatory member of the HMO, Amerigroup was no longer contractually obligated to pay her medical expenses.

## B. *Retroactive Disenrollment from the HMO.*

A recently decided opinion from our sister court in Austin supports the Commission's determination that federal law precluded Carraway's mandatory membership in the HMO once she lost her TANF-eligibility. *See Hawkins v. El Paso First Health Plans, Inc.*, 214 S.W.3d 709 (Tex. App.-Austin 2007, pet. filed) In *Hawkins*, the court affirmed a declaratory judgment

that Medicaid beneficiaries who are eligible for SSI and who reside in any Texas County outside of Harris County ... if enrolled in a STAR [HMO] at the time the SSA makes its determination, must be disenrolled from the STAR [HMO] retroactive to the date the beneficiary became eligible for SSI so that they may [elect whether to voluntarily participate in a STAR HMO]. *Id.* at 723. *Hawkins* involved infants, normally enrolled at birth in their mothers' Medicaid HMO, who became eligible for SSI because of their low birth weight. Under federal law, the infants were precluded from receiving Medicaid benefits from their mothers' HMO because as SSI recipients they could only participate in the HMO as voluntary members; hence the HMO was not obligated to pay their medical expenses.[14] *Id.* at 721–722. The *Hawkins* court held that an SSI-eligible infant could not qualify as a mandatory member of a Medicaid HMO because federal law does not permit a state to take away an SSI recipient's freedom to choose a health care provider. Here, the effect of federal law is the same: once Carraway became eligible for SSI, she no longer qualified for mandatory participation in an HMO. Thus, the Commission properly found that Amerigroup was no longer obligated to pay her medical expenses after December 31, 2001.

Amerigroup argued in the trial court that it was not responsible for any of Carraway's medical expenses because she was deemed retroactively eligible for SSI effective February 2001, a date that preceded her December 2001 hospital admission. We need not address the issue of retroactive disenrollment here. On appeal, Amerigroup is not contesting its obligation to cover Carraway's medical expenses incurred from December 19–31, 2001.

---

**14.** Of course, the infants, like a woman in a coma, are not capable of making an election to be a voluntary member of an HMO. Instead, they become part of the traditional Medicaid program which reimburses the provider on a fee-for-services basis.

Therefore, we need not decide the issue of retroactive disenrollment or its consequences for this dispute.

### C. *Hearsay.*

 Methodist next asserts that Amerigroup is liable under paragraph 6.3.2 of the Commission Contract because the evidence Amerigroup submitted to establish the Commission's eligibility determination was hearsay. The evidence about which Methodist complains consists of two e-mails from the Commission and a letter from the assistant general counsel of the Commission. Although Methodist objected on the basis of hearsay, it failed to obtain a ruling. It is well-established that in the absence of an objection, hearsay may be competent summary judgment evidence. *See* TEX.R. EVID. 802 (stating that hearsay not objected to has probative value); *Dolenz v. A.B.*, 742 S.W.2d 82, 83–84, n. 2 (Tex.App.-Dallas 1987, writ denied) (failure to object waives complaint of inadmissible evidence on appeal). When a party makes a hearsay objection, but fails to obtain a ruling, the right to challenge the evidence on appeal is waived. *See St. Paul Ins. Co. v. Mefford,* 994 S.W.2d 715, 721 (Tex.App.-Dallas 1999, pet. denied); *Dolcefino v. Randolph,* 19 S.W.3d 906, 926 (Tex.App.-Houston[14th Dist.] 2000, pet. denied). Because Methodist failed to obtain a ruling on its objection, it waived its right to complain about the evidence. We turn now to whether the evidence establishes a loss of Medicaid eligibility under the Commission Contract.

### D. *The Commission's Eligibility Determinations.*

 The first e-mail from the Commission dated February 22, 2002, was written in response to Amerigroup's inquiry about the impact of Carraway's loss of TANF eligibility on its obligation to pay for Carraway's medical expenses after December 31, 2001. Citing to paragraph 6.3.2 of the Commission Contract, the e-mail stated:

> Carraway ... lost Medicaid eligibility as of January 1, 2002. When she reenrolled as an Amerigroup member effective 01 February 2001, it was as a voluntary SSI risk group member. This means that after 01/01/02, providers should bill NHIC....

Methodist subsequently requested an investigation. In response, on December 9, 2002, the Commission decided that there had been no loss of Medicaid eligibility and Amerigroup was responsible for charges incurred after December 31, 2001. This determination, however, was based on a review of the incorrect version of the Commission Contract, which defined a loss of Medicaid eligibility differently than the controlling version of the Commission Contract.[15]

When the Commission reconsidered its December 2002 decision, it determined it had made a mistake. In an e-mail dated March 4, 2003, the Commission announced that Amerigroup was not responsible for Carraway's medical expenses after January 1, 2002. This decision was communicated again on May 22, 2003, in a letter to Methodist's counsel from the assistant general counsel for the Commission. The letter stated that Carraway was properly removed from the Medicaid eligibility rolls as of midnight December 31, 2001 and had a "real time" loss of Medicaid eligibility as

---

**15.** Apparently the decision was based on an amended version of the Commission Contract dated August 29, 2002 rather than the 1999 version of the contract that controls the issues here. Section 14.4.1 of the applicable contract defines a temporary loss of Medicaid eligibility as a period of six months or less. The amended version requires at least a one month lapse in Medicaid coverage before Medicaid eligibility is deemed terminated.

of January 1, 2002 until January 8, 2002, the date that she was certified by Social Security to be SSI eligible. Therefore, the Commission determined that NHIC, not Amerigroup, was the party responsible for payment of her medical expenses after December 31, 2001.

There is no question that the Commission had the statutory and contractual authority to determine Carraway's Medicaid eligibility. *See* 1 TEX. ADMIN. CODE § 353.403(b); *see also,* 42 U.S.C. § 1396a(a)(5) (determination of Medicaid eligibility shall be made by State or local agency). Under the terms of paragraph 14.2.1 of the Commission Contract, the Commission has the right and responsibility to enroll and disenroll eligible individuals in the STAR program. Paragraph 14.1.1 provides that the Commission will identify Medicaid recipients who are eligible for participation. Under paragraph 14.1.2.2, adults who are receiving TANF are eligible to be mandatory participants. Under paragraphs 14.1.3 and 14.1.3.1, SSI recipients may only elect to participate as voluntary members in the HMO; under the federal waiver they are not eligible to be mandatory members. The Commission properly disenrolled Carraway as a mandatory member: Amerigroup is contractually obligated to accept the Commission's eligibility determinations.

The Commission also determined Carraway lost her Medicaid eligibility on December 31, 2001. The resulting loss of TANF-based Medicaid eligibility meant Carraway was not eligible for mandatory STAR participation under the federal waiver. Despite the language of paragraph 6.3.2 of the Commission Contract, her change in status to a voluntary member required that she be disenrolled as a mandatory member. Consequently, the Commission properly concluded Ameri-

group was not contractually responsible for Carraway's medical expenses after December 31, 2001.

Methodist advances additional variations of its argument that Carraway did not become ineligible for Medicaid on December 31. First, it claims that voluntary withdrawal from TANF does not necessarily constitute a loss of Medicaid eligibility. Similarly, Methodist argues that if TANF benefits are denied or withdrawn, states are prohibited from terminating Medicaid eligibility until all possible avenues have been explored and exhausted. These arguments are misplaced. The question of whether the Commission made an erroneous eligibility determination is not at issue here. Amerigroup was contractually bound to accept the Commission's eligibility determinations. Moreover, paragraph 6.6 of the Provider Contract states:

> In the event that any action of a governmental authority impairs, limits, or delays Americaid's performance of any obligation hereunder, Americaid shall be excused from such performance, and Americaid's failure to perform such obligation for such reason shall not constitute a breach of this Agreement.[16]

Once the Commission determined Carraway's ineligibility to participate in STAR, Amerigroup's payment obligations ceased. By the terms of the contract, Amerigroup could not have breached its contract by declining to treat Carraway as a mandatory member once she was ineligible for this status under federal law.

### E. *The Commission's Reconsideration of Its Initial Decision.*

▆ Methodist concedes that the Commission has the sole authority for making eligibility determinations and acknowl-

---

**16.** Amerigroup was formerly known as Americaid and executed the contract as Americaid.

edges that Amerigroup is contractually bound to accept the Commission's decision as final. But in its sixth issue, Methodist argues that the Commission's initial December 8 decision is the only binding determination the Commission made. We disagree.

Methodist has not identified any reason why the Commission lacked the power or authority to reconsider its own decisions. Methodist's own actions undermine its argument, since Methodist made two of the three informal requests for the Commission to reconsider its investigation. The May 2003 letter from the Commission's counsel was written in response to Methodist's informal request for reconsideration of the Commission's prior decision. Methodist cannot be heard to argue that the Commission only had authority to reconsider Amerigroup's liability if it agreed with Methodist's position.

Methodist's assertion that the Commission's reconsideration of its initial decision lacked sufficient formality to be binding is equally unpersuasive. As the May 22, 2003 letter explained, the Commission's review of concerns raised by Medicaid managed-care providers is an informal process. Methodist tacitly acknowledged as much by requesting the informal investigations. Methodist has not identified any specific formal process that the Commission was required but failed to follow. On the record presented, we conclude that the Commission was not prohibited from reconsidering its determinations about the eligibility of Carraway or the obligation of Amerigroup for her medical expenses. This is a case of first impression. The Commission acted within its authority to reconsider its initial determinations of the parties' contractual obligations in light of

the complex interaction of state and federal regulations. Methodist's sixth issue is resolved against it.

F. *Liability Under the Contracts.*

■ In its seventh and eighth issues, Methodist asserts that Amerigroup is liable because Carraway was a covered person receiving covered services under the Provider Contract. Consequently, Methodist argues Amerigroup was liable for Carraway's medical expenses under the continuation of care provision of the Provider Contract. A "covered person" is defined as a Medicaid enrollee for whom the Commission has agreed to pay for covered services. "Covered services" are limited to health care services that covered persons are entitled to receive. Based on the Commission's determination, after December 31, 2001, Carraway was not a covered person receiving covered services. The Commission determined Carraway was not eligible for mandatory enrollment in the HMO after that date, and the HMO only pays for health care services provided to mandatory enrollees. Healthcare services provided to voluntary enrollees are reimbursed under the traditional fee-for-service Medicaid program. Methodist's reliance on the continuation of care provision of the contract is also flawed. Under this provision, Amerigroup may be responsible for expenses incurred by a "covered person of special circumstance." But this provision only applies to covered persons.[17] Furthermore, Methodist has contractually waived the right to proceed against Amerigroup when the Commission makes coverage decisions with which it disagrees. Paragraph 2.21 of the Provider Contract states:

**17.** Additionally, the record does not reflect that Methodist complied with the notice pro-

visions of this paragraph.

Hospital waives and shall not have any cause of action ... against Amerigroup ... and hereby releases ... all claims, demands, obligations, liabilities and causes of action of every nature whatsoever, relating to, arising out of, or resulting from Amerigroup's compliance with its obligations to [the Commission] to deny or limit Hospital's reimbursement for services to Covered Persons.

Methodist has contractually waived its right to complain about the Commission's coverage decision. Methodist's seventh and eighth issues are resolved against it.

### G. *Payment.*

In its fifth and ninth issues, Methodist argues the payment it received from the State does not discharge Amerigroup from liability, and Amerigroup breached an obligation to promptly pay claims. Both of these issues depend on an assumption that Amerigroup was contractually responsible for payment of these expenses. Because we have determined that Amerigroup was not liable for Carraway's medical expenses after December 31, 2001, we resolve Methodist's fifth and ninth issues against it.

In its remaining issues, Methodist argues Amerigroup was responsible for payment of Carraway's medical expenses after December 31, 2001, pursuant to various other terms of the Commission Contract. Because we conclude that the Commission properly determined that, in light of federal law, Carraway no longer qualified as a mandatory member of Amerigroup after December 31, 2001, and that the Commission had the authority to determine that there was a gap in Carraway's Medicaid eligibility between January 1–8, 2002, we need not address Methodist's remaining issues. *See Carr,* 776 S.W.2d at 567. We affirm the trial court's summary judgment in favor of Amerigroup.